# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| WOLVERINE BARCODE IP, LLC,<br>　　　Plaintiff, | |
| | Civil Action No. 2:26-cv-00023-RWS-RSP |
| v. | |
| POPEYES LOUISIANA KITCHEN, INC.,<br>　　　Defendant. | JURY TRIAL DEMANDED |

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Wolverine Barcode IP LLC ("Wolverine") files this First Amended Complaint and demand for jury trial seeking relief from patent infringement of the claims of U.S. Patent No. 9,280,689 ("the '689 patent") (referred to as the "Patent-in-Suit") by Popeyes Louisiana Kitchen, Inc. ("Defendant" or "Popeyes"). This First Amended Complaitn is filed within 21 days of Defendant's Rule 12 Motion, ECF No. 12.

### I.　　THE PARTIES

1.　Wolverine is a Texas Limited Liability Company with its principal place of business located in Austin, Texas.

2.　On information and belief, Defendant is a corporation organized in Delaware with  a principal office at 4415 Highway 6, Sugar Land, TX 77478 and other corporate offices at 4809 Cole Avenue, Suite 330, Dallas, TX 75205 and 5707 Waterford District Dr, Miami, FL 33126, and regular and established places of business located at 1600 E Spring Creek Pkwy, Plano, TX 75074 and 1917 W 15th St, Plano, TX, 75075. On information and belief, Defendant sells and offers to sell products and services throughout Texas, including in this judicial district, and introduces products and services that perform infringing methods or processes into the stream of commerce knowing that they would be sold in Texas and this judicial district. Defendant has been served.

1

## II.    JURISDICTION AND VENUE

3.    This Court has original subject-matter jurisdiction over the entire action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Plaintiff's claim arises under an Act of Congress relating to patents, namely, 35 U.S.C. § 271.

4.    This Court has personal jurisdiction over Defendant because: (i) Defendant is present within or has minimum contacts within the State of Texas and this judicial district; (ii) Defendant has purposefully availed itself of the privileges of conducting business in the State of Texas and in this judicial district; and (iii) Plaintiff's cause of action arises directly from Defendant's business contacts and other activities in the State of Texas and in this judicial district.

5.    Venue is proper in this district under 28 U.S.C. §§ 1400(b).  Defendant has committed acts of infringement and has a regular and established place of business in this District.  Further, venue is proper because Defendant conducts substantial business in this forum, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or deriving substantial revenue from goods and services provided to individuals in Texas and this District.

## III.    INFRINGEMENT - Infringement of the '689 Patent

6.    On March 8, 2016, U.S. Patent No. 9,280,689 ("the '689 patent", included as Exhibit A) entitled "Method and Apparatus for Doing Offline Commerce Transactions" was duly and legally issued by the U.S. Patent and Trademark Office. Plaintiff owns the '689 patent by assignment.

7.    The '689 patent relates to novel and improved methods and apparatuses for conducting offline transactions that use a barcode as a method of personal identification.

2

8. Popeyes has directly infringed and continues to directly infringe at least claim 1 of U.S. Patent No. 9,280,689 under 35 U.S.C. § 271(a) by performing, directing, controlling, and/or causing performance of each step of the claimed method through the Popeyes Rewards in-restaurant transaction system, including Popeyes' mobile application and website, Popeyes Rewards accounts, Popeyes-controlled Rewards servers and databases, Popeyes point-of-sale ("POS") and cash-register systems, vendor/POS servers, barcode/QR scanners, in-restaurant receipt and approval systems, and participating Popeyes restaurants.

9. The accused method is the in-store Popeyes Rewards transaction workflow by which a Popeyes Rewards member uses a scannable Popeyes Rewards QR code or barcode at a participating Popeyes restaurant to earn and/or redeem rewards in connection with the purchase of Popeyes food items. The accused workflow is not merely the use of a mobile application in isolation. It is the integrated in-store transaction flow in which Popeyes' POS system scans or reads both: (i) Popeyes product, menu-item, modifier, offer, coupon, SKU, PLU, or other product-price barcode data associated with the items being purchased, and (ii) the customer's Popeyes Rewards QR code or barcode that identifies the customer's Rewards account, and then transmits the transaction data to Popeyes-controlled vendor/POS and Rewards servers for approval, crediting, redemption, receipt generation, and transaction completion.

10. On information and belief, Popeyes designs, specifies, administers, and controls the accused Popeyes Rewards transaction workflow. Popeyes provides the Popeyes Rewards program, creates and maintains Popeyes Rewards accounts, assigns unique member identifiers or personal codes, converts or causes those identifiers to be represented as scannable QR codes or barcodes, stores those identifiers in Popeyes' Rewards servers, dictates how the scannable code must be presented and scanned at participating Popeyes restaurants, configures or requires the

3

configuration of the POS/cash-register and scanner systems used in participating restaurants, determines the circumstances under which Rewards points or rewards may be earned or redeemed, and causes the POS/register system to receive and display approval, rejection, receipt, or other transaction-completion signals.

11. To the extent any step of claim 1 is performed by a Popeyes employee, cashier, restaurant operator, franchisee, POS/rewards vendor, or customer, that performance is attributable to Popeyes. Popeyes conditions participation in Popeyes Rewards and receipt of the Rewards benefits—including earning points, redeeming rewards, applying offers, discounts, free-food items, and receiving transaction credit—on the participant performing the required Popeyes-specified steps in the required Popeyes-specified manner and timing. In particular, Popeyes requires the customer to enroll in Popeyes Rewards, access or store the Popeyes Rewards QR code or barcode in the Popeyes app or website, present that code at the register or payment window, complete an eligible in-store Popeyes transaction, and have the code scanned in the Popeyes-prescribed checkout workflow. If those steps are not performed as Popeyes requires, the customer does not receive the Rewards benefit.

12. Popeyes likewise directs and controls participating Popeyes restaurants, their cashiers, and their POS/rewards vendors with respect to the accused transaction workflow. On information and belief, participating Popeyes restaurants must use Popeyes-approved POS systems, Popeyes-approved scanner systems, Popeyes-approved menu/reward/product-price databases, Popeyes-approved in-store Rewards procedures, and Popeyes-controlled or Popeyes-specified servers to process Popeyes Rewards transactions. Popeyes establishes the timing and manner in which the customer's Rewards QR code or barcode is scanned, how product/menu/reward item data is entered or scanned, how the resulting transaction data is transmitted to Popeyes' vendor/POS and

4

Rewards servers, and how approval, rejection, reward credit, reward redemption, and receipt information is returned to the register.

13. Popeyes' conduct satisfies the preamble of claim 1 because the accused Popeyes Rewards in-store transaction workflow is a method for conducting offline electronic commerce transactions at Popeyes restaurants having vendor barcode scanners or QR/barcode scanners and vendor cash registers or POS terminals. Popeyes restaurants use scanners and POS/cash-register systems to conduct in-store transactions involving Popeyes food purchases and Popeyes Rewards earning or redemption.

14. Popeyes satisfies limitation 1(a), "providing a personal code to a person for their use to purchase goods," by assigning or causing to be assigned to each Popeyes Rewards member a unique Rewards member identifier, account identifier, token, UUID, digital ID number, or other personal code associated with that customer's Popeyes Rewards account. The personal code is used to identify the customer in connection with eligible Popeyes purchase transactions, including in-store purchases at participating Popeyes restaurants.

15. Popeyes satisfies limitation 1(b), "converting said personal code into barcode format to form a User ID Barcode," by converting or causing conversion of the customer's unique Popeyes Rewards identifier into a scannable QR code, barcode, or equivalent machine-readable code displayed in or accessed through the Popeyes mobile application, website, or Rewards interface. The Popeyes Rewards QR code or barcode corresponds to the customer's personal code and includes distinguishing coding, formatting, symbology, prefixes, delimiters, special characters, embedded fields, control characters, or other non-product-identifying data that causes the Popeyes POS/vendor server to recognize the scanned code as a customer Rewards/User ID code rather than as a Popeyes product barcode.

16. Popeyes satisfies limitation 1(c), "storing said personal code in said User ID Barcode format by said person for use to purchase goods and storing said personal code in a User Vendor Management Server to permit purchases to be made at a vendor," because the Popeyes Rewards QR code or barcode is stored, accessed, or displayed on the customer's mobile device through the Popeyes app or website for use in in-store Popeyes purchase transactions, and the corresponding personal code, Rewards identifier, account token, and transaction data are stored in Popeyes' Rewards servers, databases, online systems, or related vendor/POS systems. Those systems function as the claimed User Vendor Management Server because they manage user accounts, store user identifiers and transaction records, process user Rewards transactions, and permit Popeyes purchases and Rewards earning or redemption at participating Popeyes restaurants.

17. Popeyes satisfies limitation 1(d), "establishing a User Account in a User Vendor Management Server corresponding to said personal code," by creating or causing the creation of a Popeyes Rewards account corresponding to the customer's unique Rewards identifier, personal code, QR code, or barcode. Popeyes stores the account and corresponding identifier in Popeyes-controlled Rewards servers and databases.

18. Popeyes satisfies limitation 1(e), "depositing funds in said User Account to establish a credit limit," by depositing, crediting, or causing to be credited Rewards points, reward credits, stored promotional value, redemption credits, discounts, offers, or other electronic value into the customer's Popeyes Rewards account. These points or credits function as account funds or a credit limit because they establish the amount or scope of value the customer may apply toward Popeyes food items, rewards, discounts, or free menu items in subsequent eligible Popeyes transactions. For example, Popeyes Rewards credits points based on qualifying purchases and permits

accumulated points or credits to be redeemed for eligible Popeyes menu items, thereby establishing a redeemable account balance or credit limit.

19. Popeyes satisfies limitation 1(f), "conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server," because, during in-store Popeyes Rewards transactions at participating Popeyes restaurants, the Popeyes POS/cash-register system scans or reads Popeyes product/menu/reward/offer/modifier barcode data, SKU data, PLU data, QR data, or equivalent product barcode data that identifies the Popeyes item or reward being purchased or redeemed and includes or is associated with the product price or modifier price. The same POS/cash-register scanner also scans the customer's Popeyes Rewards QR code or barcode. The POS/register system then transmits both the product/menu/product-price data and the customer User ID Barcode data to Popeyes' vendor/POS server, Rewards server, or related online computer systems.

20. For limitation 1(f), the accused "product barcode" is the Popeyes in-restaurant product, menu-item, modifier, reward, coupon, offer, SKU, PLU, or equivalent product-price barcode or code used by the Popeyes POS/cash-register system in the same in-store transaction in which the customer's Popeyes Rewards QR code or barcode is scanned. Plaintiff does not rely on a product barcode from an unrelated third-party retail transaction as the product barcode for the accused in-store Popeyes Rewards transaction.

21. Popeyes satisfies limitation 1(g), "detecting the User ID Barcode at the vendor server and forwarding the ID Barcode and purchase price to said User Vendor Management Server," because Popeyes' POS/vendor server detects that the scanned Popeyes Rewards QR code or barcode is a

7

customer Rewards/User ID code, distinguishes it from product/menu/product-price barcode data, and forwards or makes available the customer identifier, Rewards account data, transaction data, and purchase price, modifier price, or reward-redemption price to Popeyes' Rewards servers, databases, online systems, or other servers functioning as the claimed User Vendor Management Server.

22. Popeyes satisfies limitation 1(h), "comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit in the User Vendor Management Server account, and if there are, sending an approval signal to the vendor server," because Popeyes' Rewards servers or related online systems compare the applicable purchase price, modifier price, reward price, point cost, discount value, or redemption requirement with the customer's available Rewards points, credits, offers, discounts, or redeemable account balance. If sufficient points, credits, funds, or redeemable value are available, Popeyes' servers approve the earning or redemption transaction and send an approval, authorization, receipt, reward-crediting, reward-redemption, or transaction-completion signal to the Popeyes vendor/POS server.

23. Popeyes satisfies limitation 1(i), "forwarding the approval signal to the vendor cash register," because the Popeyes vendor/POS server forwards the approval, authorization, receipt, reward-crediting, reward-redemption, or transaction-completion signal to the Popeyes POS/cash-register terminal, where the transaction is completed, reflected on the in-restaurant receipt, and/or used to apply the Rewards benefit.

24. Popeyes satisfies the final limitation of claim 1, "repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode," because Popeyes Rewards members repeatedly use the same or corresponding Popeyes Rewards QR code or barcode in

subsequent eligible in-store Popeyes transactions, and Popeyes' POS/cash-register systems, vendor/POS servers, and Rewards servers repeat the same scanning, detecting, forwarding, comparing, approving, and receipt/transaction-completion steps for those subsequent purchases.

25. Accordingly, Popeyes directly infringes claim 1 because Popeyes performs every step of the claimed method itself and/or through acts attributable to Popeyes, including acts of Popeyes employees, cashiers, participating restaurant operators, POS/rewards vendors, and customers whose conduct Popeyes directs, controls, conditions, and specifies. Popeyes receives monetary and commercial benefit from the accused method, including increased sales, increased customer loyalty, customer data collection, Rewards program engagement, repeat purchases, and reduced checkout friction.

26. The foregoing allegations are based on publicly available information, Plaintiff's pre-suit investigation, the Popeyes Rewards program materials, in-store Popeyes Rewards transaction information, and reasonable inferences concerning the operation of Popeyes' POS, scanner, Rewards, and server systems. Discovery is expected to confirm further details concerning the internal operation of Popeyes' POS systems, vendor servers, Rewards servers, databases, scanning workflows, product/menu/reward code formats, account-crediting logic, approval signals, and agreements or requirements by which Popeyes directs and controls participating restaurants, POS vendors, and Rewards users.

27. Support for the allegations of infringement may be found in the the chart attached as Exhibit B.  These allegations of infringement are preliminary and are therefore subject to change.

28. **Induced Infringement.** Popeyes has induced and continues to induce infringement of at least claim 1 of the '689 patent under 35 U.S.C. § 271(b). As alleged above, Popeyes and/or participating Popeyes restaurant operators, franchisees, cashiers, POS/rewards vendors, and

9

customers directly infringe claim 1 by performing all steps of the claimed method, either personally or through acts attributable to a single directing or controlling entity. Since at least service of the Original Complaint and its attached Exhibits A and B, Popeyes has had actual knowledge of the '689 patent, the asserted claims, and Plaintiff's infringement allegations, including Plaintiff's allegations that the accused Popeyes Rewards in-store transaction workflow uses a Popeyes Rewards User ID Barcode or QR code, Popeyes Rewards accounts, Popeyes Rewards servers, Popeyes POS/vendor servers, in-store barcode/QR scanners, product/menu-item/product-price data, Rewards points or credits, and approval or receipt signals to complete eligible in-store Popeyes purchase and Rewards transactions. Despite that knowledge, Popeyes has knowingly, intentionally, and specifically encouraged, instructed, directed, and caused others to perform the accused method. Popeyes does so by providing, maintaining, advertising, and operating the Popeyes Rewards program; instructing customers to enroll in Popeyes Rewards, obtain and store a Popeyes Rewards QR code or barcode, present or scan that code at participating Popeyes restaurants, and complete eligible transactions to earn or redeem Rewards benefits; instructing and requiring participating Popeyes restaurants, cashiers, franchisees, operators, and POS/rewards vendors to use Popeyes-approved POS systems, scanners, Rewards software, server interfaces, menu/product-price databases, and transaction procedures; and configuring the accused systems so that, during the same in-store transaction, the Popeyes POS system scans or reads product, menu-item, reward, offer, coupon, SKU, PLU, modifier, or equivalent product-price data together with the customer's Popeyes Rewards User ID Barcode or QR code, transmits that data to Popeyes' vendor/POS and Rewards servers, detects and processes the User ID Barcode, compares the applicable purchase price, modifier price, reward price, point cost, discount value, or redemption requirement with the customer's available Rewards points, credits, funds, offers, or

10

redeemable value, and returns an approval, authorization, reward-crediting, reward-redemption, receipt, or transaction-completion signal to the Popeyes register. Popeyes' specific intent to induce infringement is shown by, among other things, Popeyes' continued operation of the accused Rewards workflow after knowledge of the '689 patent, its provision of step-by-step customer-facing instructions and app prompts for in-store scanning, its restaurant-facing requirements and technical configurations for POS scanning and Rewards processing, its conditioning of Rewards benefits on customers and restaurants performing the Popeyes-specified in-store scanning workflow, and its commercial benefit from increased sales, customer loyalty, customer data collection, and repeat Popeyes transactions. Plaintiff reserves the right to amend if discovery reveals an earlier date of Popeyes' knowledge of the '689 patent or further acts of inducement.

29. **Contributory Infringement.** Popeyes has contributorily infringed and continues to contributorily infringe at least claim 1 of the '689 patent under 35 U.S.C. § 271(c). Popeyes offers to sell, sells, provides, licenses, and/or makes available in the United States, as part of its commercial Popeyes Rewards-enabled in-store food transactions, material apparatuses and materials for use in practicing the patented process, including the Popeyes Rewards in-store scan-and-redeem components, the Popeyes Rewards User ID Barcode or QR code generated for a particular Rewards account, the Popeyes Rewards account and account-token infrastructure, the Popeyes in-store POS Rewards scanning module, the Popeyes POS/vendor-server and Rewards-server interfaces, APIs, databases, and transaction protocols that receive product/menu/product-price data and User ID Barcode data, compare the applicable price or redemption requirement against available Rewards points, credits, funds, offers, discounts, or redeemable value, and return approval, redemption, crediting, receipt, or transaction-completion signals to the Popeyes register. These accused contributory components are a material part of the claimed invention because they

11

supply and enable the personal-code/User ID Barcode, User Account, User Vendor Management Server, product-price transmission, User ID Barcode detection, price-versus-funds comparison, approval-signal, and repeated-transaction functionality recited in claim 1. These accused components are especially made or especially adapted for use in infringing the '689 patent because Popeyes designs, configures, and deploys them specifically to conduct in-store Popeyes Rewards transactions in which a customer's Popeyes Rewards User ID Barcode or QR code is scanned or read in connection with product/menu/product-price transaction data and processed through Popeyes' POS/vendor and Rewards servers to earn or redeem Rewards benefits. The accused contributory components, as narrowly identified here, are not staple articles or commodities of commerce suitable for substantial non-infringing use. Plaintiff does not accuse the general-purpose smartphone, general-purpose barcode scanner, or the entire Popeyes mobile application standing alone as the non-staple component. Rather, Plaintiff accuses the Popeyes-specific Rewards User ID Barcode or QR code and the Popeyes-specific in-store scan-and-redeem POS/rewards-server integration, whose only substantial commercial purpose is to identify the Popeyes Rewards member in an eligible in-store Popeyes transaction, process the associated product/menu/product-price and Rewards data, determine whether Rewards points, credits, funds, offers, discounts, or redeemable value are available, and return approval, redemption, crediting, receipt, or transaction-completion signals. Since at least service of the Original Complaint and its attached Exhibits A and B, Popeyes has known that these accused components are especially made or especially adapted for use in practicing the asserted method and that use of those components in the accused in-store Popeyes Rewards workflow infringes the '689 patent. By continuing to offer, sell, provide, license, maintain, configure, and make available those components for use by participating Popeyes restaurants, franchisees, operators, cashiers, POS/rewards vendors, and customers,

12

Popeyes contributes to their direct infringement of the '689 patent. Plaintiff reserves the right to amend if discovery reveals an earlier date of Popeyes' knowledge of the '689 patent or further facts concerning Popeyes' contributory infringement.

30. Defendant has caused and will continue to cause Plaintiff damage by direct and indirect infringement of (including inducing infringement of) the claims of the '689 patent.

## IV.   JURY DEMAND

31. Plaintiff hereby requests a trial by jury on issues so triable by right.

## V.   CONDITIONS PRECEDENT

32.  Plaintiff has never sold a product.  Upon information and belief, Plaintiff predecessor-in-interest has never sold a product.  Plaintiff is a non-practicing entity, with no products to mark. Plaintiff has pled all statutory requirements to obtain pre-suit damages.  Further, all conditions precedent to recovery are met.  Under the rule of reason analysis, Plaintiff has taken reasonable steps to ensure marking by any licensee producing a patented article.

33.  Plaintiff and its predecessors-in-interest have entered into settlement licenses with several defendant entities, but none of the settlement licenses were to produce a patented article, for or under the Plaintiff's patents. Duties of confidentiality prevent disclosure of settlement licenses and their terms in this pleading but discovery will show that Plaintiff and its predecessors-in-interest have substantially complied with Section 287(a). Furthermore, each of the defendant entities in the settlement licenses did not agree that they were infringing any of Plaintiff's patents, including the Patents-in-Suit, and thus were not entering into the settlement license to produce a patented article for Plaintiff or under its patents.  Further, to the extent necessary, Plaintiff will limit its claims of infringement to method claims and thereby remove any requirement for marking.

13

34. To the extent Defendant identifies an alleged unmarked product produced for Plaintiff or under Plaintiff's patents, Plaintiff will develop evidence in discovery to either show that the alleged unmarked product does not practice the Patents-in-suit and that Plaintiff has substantially complied with the marking statute. Defendant has failed to identify any alleged patented article for which Section 287(a) would apply. Further, Defendant has failed to allege any defendant entity produce a patented article.

35. The policy of § 287 serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented.

36. These policy considerations are advanced when parties are allowed to freely settle cases without admitting infringement and thus not require marking. All settlement licenses were to end litigation and thus the policies of §287 are not violated. Such a result is further warranted by 35 U.S.C. §286 which allows for the recovery of damages for six years prior to the filing of the complaint.

37. For each previous settlement license, Plaintiff understood that (1) the settlement license was the end of litigation between the defendant entity and Plaintiff and was not a license where the defendant entity was looking to sell a product under any of Plaintiff's patents; (2) the settlement license was entered into to terminate litigation and prevent future litigation between Plaintiff and defendant entity for patent infringement; (3) defendant entity did not believe it produced any product that could be considered a patentable article under 35 U.S.C. §287; and, (4) Plaintiff believes it has taken reasonable steps to ensure compliance with 35 U.S.C. §287 for each prior settlement license.

14

38. Each settlement license that was entered into between the defendant entity and Plaintiff was negotiated in the face of continued litigation and while Plaintiff believes there was infringement, no defendant entity agreed that it was infringing.  Thus, each prior settlement license reflected a desire to end litigation and as such the policies of §287 are not violated.

39. For any prior settlement, the settling defendant was not licensed to make and sell infringing products in the future, thus the marking statute imposes no obligation on PLAINTIFF to make an effort to require a prior settling defendant to mark the products PLAINTIFF had accused of infringing its patents.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiif prays for relief as follows:

  a.    enter judgment that Defendant has infringed the claims of the '689 patent;

  b.    award Plaintiff damages in an amount sufficient to compensate it for Defendant's infringement of the Patents-in-Suit in an amount no less than a reasonable royalty or lost profits, together with pre-judgment and post-judgment interest and costs under 35 U.S.C. § 284;

  c.    award Plaintiff an accounting for acts of infringement not presented at trial and an award by the Court of additional damage for any such acts of infringement;

  d.    declare this case to be "exceptional" under 35 U.S.C. § 285 and award Plaintiff its attorneys' fees, expenses, and costs incurred in this action;

  e.    provided discovery reveals that Defendant knew (1) knew of the patent-in-suit prior to the filing date of the lawsuit; (2) after acquiring that knowledge, it infringed the patent; and (3) in doing so, it knew, or should have known, that its conduct amounted to infringement of the patent, declare Defendants' infringement to be willful and treble the damages, including

15

attorneys' fees, expenses, and costs incurred in this action and an increase in the damage award pursuant to 35 U.S.C. § 284;

f.  a decree addressing future infringement that either (i) awards a permanent injunction enjoining Defendant and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with Defendant from infringing the claims of the Patents-in-Suit, or (ii) awards damages for future infringement in lieu of an injunction in an amount consistent with the fact that for future infringement the Defendant will be an adjudicated infringer of a valid patent, and trebles that amount in view of the fact that the future infringement will be willful as a matter of law; and

g.  award Plaintiff such other and further relief as this Court deems just and proper.

Respectfully submitted,

**Ramey LLP**

*/s/ William P. Ramey, III*
William P. Ramey, III
Texas Bar No. 24027643
wramey@rameyfirm.com
446 Heights Blvd., Suite 200
Houston, Texas 77007
(713) 426-3923 (telephone)
(832) 900-4941 (fax)

***Attorneys for Wolverine Barcode IP LLC***

## CERTIFICATE OF SERVICE

Pursuant to the Texas Rules of Civil Procedure, I hereby certify that all counsel of record who have appeared in this case are being served on this day of April 30, 2026, with a copy of the foregoing and ECF filing.

*/s/ William P. Ramey, III*
William P. Ramey, III

16